IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| ANN VICTORIA BREWER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. 4:11-CV-3233-SLB ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The plaintiff, Henry , brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for disabled widow's benefits.  Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a

conclusion." Bloodsworth, at 1239.  This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm the Commissioner's decision if it is supported by substantial evidence.  Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).

## STATUTORY AND REGULATORY FRAMEWORK

In order to be entitled to disabled widow's benefits, a claimant must be disabled and meet the eligibility requirements set forth in 20 C.F.R. § 404.335.  The ALJ found the plaintiff was the unmarried widow of the deceased insured worker and had attained the age of 50.  R. 16.  Therefore, he found the plaintiff met the non-disability requirements for disabled widow's benefits.  R. 16.

In order to qualify for disability benefits and to establish entitlement for a period of disability, a claimant must be disabled.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  For the purpose of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, the Social Security regulations outline a five-step sequential process.  20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether she has a severe impairment;

    (3)    whether her impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform her past work; and

    (5)    whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord  McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

    In the present case, the ALJ determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment.  The ALJ found the plaintiff had no past relevant work.  Once it is determined that the plaintiff cannot return to her prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, at 1559.  When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids.  Foote, at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony."  Id.

    The ALJ found the plaintiff had the residual functional capacity ("RFC") to perform "light work as defined in 20 C.F.R. § 404.1567(b) except the claimant is limited to non-complex

3

job tasks, with a sit/stand option, no production quotas, no extremes of temperature, and contact with the general public and co-workers is brief, informal and casual." R. 21.  Based upon that RFC and the testimony of a vocational expert, the ALJ determined the plaintiff could perform other work as an entry level inspector, tester, sorter, and sampler.  R. 25, 257.  Accordingly, he found the plaintiff was not disabled.  R. 25.

## FACTUAL BACKGROUND

The plaintiff alleges she is disabled due to depression and anxiety attacks.  Pl.'s Br. 2. She alleges she became disabled on January 20, 1997.  R. 14.  The record shows the plaintiff sought treatment at Alabama Psychiatric Services, P.C. on July 23, 2004, after a long absence. R. 149.  She reported increased anxiety, some panic attacks, dysphoria, and anhedonia.  R. 149. She was given a prescription for Zoloft[1] and was to return in thirty days.  R. 149.  On August 20, 2004, the plaintiff was placed on Remeron[2] and clonazepam.[3]  R. 148.  The plaintiff reported no side effects from her medications.  R. 148.

The next treatment record from Alabama Psychiatric Services is from June 14, 2005.  R. 147.  The plaintiff reported discord with her daughter and husband.  R. 147.  She reported an increase in her anxiety and panic attacks, and no side effects from her medications.  R. 147.  Her

---

[1] "Zoloft (sertraline) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs)."  http://www.drugs.com/zoloft.html

[2] "Remeron (mirtazapine) is a tetracyclic antidepressant." http://www.drugs.com/remeron.html

[3] "Klonopin (clonazepam) is in a group of drugs called benzodiazepines . . . . Clonazepam affects chemicals in the brain that may become unbalanced and cause anxiety." http://www.drugs.com/klonopin.html

clonazepam was increased and Wellbutrin[4] was added to her prescriptions. R. 147. She was to return to care in six months. R. 147. However, the next treatment note is from May 16, 2006, when the plaintiff's medications were listed as Remeron and clonazepam. R. 146. The treatment note states the plaintiff was doing well despite a very difficult family situation. R. 146. The next treatment note is from April 23, 2007, when it was noted the plaintiff was "doing relatively well." R. 145.

The plaintiff was first seen by Dr. Barnett, a psychiatrist, on May 2, 2008. R. 192. The plaintiff's affect was blunted and her mood was depressive. R. 144. The plaintiff denied suicidal ideation or plans. R. 144. Dr. Barnett prescribed Remeron and clonazepam. R. 144. The plaintiff was to follow-up with Dr. Barnett in three months. R. 144.

On July 21, 2008, the plaintiff was referred to Dr. Nichols for a consultative psychological evaluation by the Social Security Administration. R. 170-173. The plaintiff reported to Dr. Nichols that her medications had "improved her mood and reduced her panic episodes." R. 170. She reported her last panic attack had occurred one year previously. R. 172. Dr. Nichols found the plaintiff's mood was mildly dysphoric and that her affect was appropriate. R. 171. The plaintiff's energy was within normal limits and she was not anhedonic. R. 171. She reported "occasional crying episodes." R. 171. Dr. Nichols found the plaintiff's speed of mental processing was adequate and that her recent and remote memory functions appeared to be grossly intact. R. 171. The plaintiff reported her daily activities included cooking and cleaning in the home. R. 172. She reported that she enjoyed caring for her two dogs and was currently learning

---

[4] "Wellbutrin (bupropion) is an antidepressant medication. It works in the brain to treat depression." http://www.drugs.com/wellbutrin.html

to play golf.  R. 172.  She also reported having several friends with whom she enjoyed spending time.  R. 172.

Dr. Nichols diagnosed the plaintiff with Dysthymic Disorder and Panic Disorder without Agoraphobia.  R. 172.  She assessed the plaintiff's current GAF score as 65.[5]  R. 172.  Dr. Nichols opined the plaintiff's "ability to relate interpersonally and withstand the pressures of everyday work is very mildly compromised due to the nature of her depressive symptoms."  R. 173.  Dr. Nichols concluded the plaintiff "does not have deficits which would interfere with her ability to remember, understand and carry out work related instructions."  R. 173.  Dr. Nichols stated that if the plaintiff "were to undergo individual counseling in combination with her current psychotropic medication regimen, her condition would likely improve over the next 12 months."  R. 173.

On August 4, 2008, Dr. Barnett noted the plaintiff's affect was appropriate and that her mood was sad.  R. 162.  The plaintiff denied suicidal ideation or plans.  R. 162.  The plaintiff reported she was under stress because "she had to put her sister out of her house."  R. 162.

When the plaintiff saw Dr. Burnett on November 3, 2008, it was noted the plaintiff had "multiple vegetative signs and symptoms [secondary] to situational stressors."  R. 161.  The plaintiff denied suicidal ideation or plans.  R. 161.  On February 2, 2009, Dr. Barnett noted the plaintiff reported "feeling less overwhelmed" and her appetite was improving.  R. 160.  The

---

[5] The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition) ("DSM-IV").  A GAF of 61-70 indicates:  "**Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, with some meaningful interpersonal relationships**."  DSM-IV at 32 (emphasis in original).

plaintiff denied suicidal ideation or plans.  R. 160.  The note states the plaintiff had "no side effects from Klonopin and Remeron."  R. 160.

The final treatment note from Dr. Barnett was from May 28, 2009.  The note states the plaintiff continued to have "multiple vegetative signs and symptoms."  R. 159.  The plaintiff denied suicidal ideation or plans.  R. 159.  The plaintiff also denied side effects from her psychological medications.  R. 159.

Dr. Barnett completed a Mental Residual Functional Capacity Questionnaire on February 16, 2009, indicating the plaintiff was diagnosed with Major Depressive Disorder, Single episode.  R. 192.  He listed the plaintiff's current GAF score as 50.[6]  Dr. Barnett indicated the plaintiff's medications were Remeron and Klonopin.  R. 192.  He indicated the plaintiff's medications gave a "marginal response" and caused "sedation."  R. 192.  Dr. Barnett stated the clinical findings that demonstrated the severity of the plaintiff's mental impairment and symptoms were "multiple vegetative signs and symptoms."  R. 192.  He assessed the plaintiff's prognosis as "poor."  R. 192.  Dr. Barnett indicated the plaintiff exhibited the following signs and symptoms:  anhedonia; decreased energy; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; poverty of content of speech; mood disturbance; difficulty thinking or concentrating; pathological dependence, passivity or aggressivity; and apprehensive expectation.  R. 193.

Dr. Barnett indicated the plaintiff was either seriously limited or unable to meet competitive standards in 14 of 16 mental abilities needed to do unskilled work.  R. 194.  These included understanding and remembering short and simple instruction; carrying out very short

---

[6] A GAF of 41-50 indicates: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV at 32 (emphasis in original).

and simple instructions; and accepting instructions and responding appropriately to criticism from supervisors.  R. 194.  In the ability to deal with normal work stress, Dr. Barnett indicated the plaintiff had no useful ability to function.  R. 194.  The only category in which Dr. Barnett indicated a less than severe limitation was asking simple questions or requesting assistance.  R. 194.

Dr. Barnett indicated the plaintiff's impairments or treatment would cause the plaintiff to miss more than four days per month.  R. 196.  He indicated the plaintiff's impairments were consistent with the limitations he assessed, and that the plaintiff was not a malingerer.  R. 196.

## DISCUSSION

The plaintiff argues the ALJ erred in giving more weight to the opinion of the consultative examiner than to the opinion of her treating psychiatrist.  Pl.'s Br. at 6. (Doc. 12 at 6).  Under the Commissioner's regulations, a treating physician's opinion will be given controlling weight if it is well supported and not inconsistent with other substantial evidence in the record.

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  In considering whether an ALJ has properly rejected a treating physician's opinion, this court is not without guidance.  "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary."  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Good cause" exists when the evidence does not bolster the treating physician's opinion; a contrary finding is supported by the evidence; or the opinion is conclusory or inconsistent with

the treating physician's own medical records.  Id.   If a treating physician's opinion is rejected, the ALJ must clearly articulate the reasons for doing so.  Id.  ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.")

The ALJ gave no weight to the RFC questionnaire completed by Dr. Barnett, the plaintiff's treating psychiatrist.  The reasons articulated by the ALJ are as follows:

> I assign no weight to the opinion in the claimant's Mental Residual Functional Capacity report.  The report does not describe any clinical findings or results of a mental status examination that demonstrated the severity of the claimant's mental impairments and symptoms, and I find the opinion is contrary to the objective evidence of record.  Moreover, I find the opinion of Dr. Nichols is more consistent with the record as a whole.  (Exhibits 9F, 12F).

R. 23-24.  Substantial evidence supports the ALJ's decision to give Dr. Barnett's RFC questionnaire no weight.

The medical records show the plaintiff sought treatment for her mental impairments approximately once per year from August 20, 2004 until May 2, 2008.  During that time, the plaintiff was noted to be doing well despite a very difficult family situation on May 16, 2006, and doing relatively well on April 23, 2007.  These treatment notes do not support the severe mental restrictions indicated by Dr. Barnett in his RFC questionnaire.

Dr. Barnett's treatment notes also fail to bolster his RFC questionnaire.  Although the plaintiff saw Dr. Barnett more frequently, his treatment notes indicate the plaintiff's condition was improving.  Dr. Barnett's treatment note closest in time to his RFC questionnaire indicates the plaintiff was "feeling less overwhelmed" and her appetite was improving.  R. 160.  Dr. Barnett's notation on his RFC questionnaire that the plaintiff had sedation as a side effect of her prescribed medication is contradicted by his treatment notes.  On February 2, 2009, and May 28,

2009, Dr. Barnett indicated the plaintiff had no side effects from her medications. R. 159-60. Therefore, Dr. Barnett's RFC questionnaire is not supported by his own treatment notes.

Dr. Barnett's RFC questionnaire is also contradicted by the report of Dr. Nichols, which the ALJ gave great weight. R. 23, 170-73. The plaintiff reported to Dr. Nichols that medications had "improved her mood and reduced her panic episodes." R. 170. The plaintiff also reported to Dr. Nichols that she enjoyed caring for her two dogs, was learning to play golf, and enjoyed spending time with her friends, which indicates her mental impairments were less severe than Dr. Barnett opined. The GAF score of 65 assessed by Dr. Nichols also contradicts Dr. Barnett's indication of severe limitations. Dr. Nichols concluded the plaintiff's ability to withstand the pressures of everyday work was only "very mildly compromised" by her depression, and that she did not have "deficits which would interfere with her ability to remember, understand and carry out work related instructions." R. 173. Dr. Nichol's report is consistent with the other medical evidence of record and provides substantial evidence to support the ALJ's decision to give Dr. Barnett's RFC questionnaire no weight.

Dr. Barnett's RFC questionnaire is not bolstered by the evidence and is contradicted by his own treatment records. The treatment notes in the record and Dr. Nichol's report are contrary to Dr. Barnett's opinions. Therefore, the ALJ had good cause for giving Dr. Barnett's RFC questionnaire no weight and that decision is supported by substantial evidence.

Plaintiff's second argument on appeal is that the ALJ erred in finding she did not met Listing 12.04. Pl.'s Br. at 8 (Doc. 12 at 8). The Listing of Impairments, are found at 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter "Listing(s)"), are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525. If a claimant establishes that his

condition meets, or is medically equivalent to, the requirements of a particular Listing, she will be found disabled. Listing 12.04 concerns affective disorders that are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." Listing 12.04. To meet Listing 12.04, a claimant must satisfy two requirements. The first (the "A criteria") requires a claimant to "substantiate medically the presence of a particular mental disorder." Listing 12.00(A). To satisfy the second requirement, the claimant's mental impairment established under the A criteria must must cause limitations of the severity specified under either the B or C criteria of the Listing. Id.

The plaintiff argues the ALJ improperly found she did not satisfy the B criteria of Listing 12.04. The B criteria of Listing 12.04 requires a claimant to demonstrate that her disorder results in at least two of the following:

1. Marked[7] restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Listing 12.04(B).

The ALJ found the plaintiff had experienced no episodes of decompensation that had been of extended duration.[8] R. 19. He also found the plaintiff had only moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration,

---

[7] For the purposes of the mental disorder listings, "marked" means "more than moderate but less than extreme." Listing 12.00(C).

[8] The plaintiff does not argue the ALJ erred in finding she had experienced no extended episodes of decompensation.

persistence, or pace. R. 18-19. The plaintiff argues the ALJ's finding of moderate limitations in these areas was in error based upon her testimony and Dr. Barnett's RFC questionnaire. As discussed above, the ALJ's decision to give Dr. Barnett's RFC questionnaire no weight was in accordance with proper legal standards and was supported by substantial evidence. Therefore, the ALJ did not err in failing to include the limitations set forth by Dr. Barnett in his finding under the B criteria of Listing 12.04.

The plaintiff's argument that her testimony establishes she meets Listing 12.04 fails because the ALJ properly considered and rejected that testimony. In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Id. (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). If an ALJ discredits a claimant's subjective complaints, he must give "explicit and adequate reasons" for his decision. See id. at 1561-62. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Id. at 1562.

The ALJ found the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. R. 21. He also found the plaintiff's statements to be credible to the extent she "would experience difficultly in performing work that required complex tasks, high production quotas, or regular contact with the public." R. 22. However, he found the plaintiff's allegations of more severe symptoms and limitations not credible. The ALJ

noted the plaintiff was "able to engage in a wide variety of activities to include driving, shopping, cooking, maintaining personal hygiene, caring for pets, and performing routine household chores." R. 22. The ALJ noted the plaintiff testified "that in the course of her day, she walks and feeds her dogs, does housework, takes a nap, and then walks her dogs again." R. 22. The ALJ observed that the plaintiff's daily living report indicated "she was able to pay bills, handle a savings account, and use a checkbook," and that she "reported she was able to read occasionally, check her e-mail and play on the computer daily." R. 22. The ALJ noted this activity was substantiated by the statement of the plaintiff's sister. R. 22.

The ALJ also observed the plaintiff reported to Dr. Nichols that she "did the cooking and cleaning in the home, . . . was learning to play golf" and that "she was never bored." R. 22. In addition, the ALJ noted Dr. Nichols opined the plaintiff's "sleep and energy was within normal limits, she was not anhedonic, and her affect was appropriate." R. 22. The ALJ also considered Dr. Nichols' GAF score of 65, which indicates only mild mental symptoms. R. 22. The plaintiff's report to Dr. Nichols that she had "several friends with whom she enjoyed spending time and enjoyed caring for her two dogs" was also noted by the ALJ. R. 22. Therefore, the ALJ articulated reasons supported by substantial evidence for his decision not to credit the plaintiff's testimony. Because the ALJ properly discredited the plaintiff's testimony, he was not required to find the plaintiff had marked limitations under the B criteria of listing 12.04 based on that testimony.

The ALJ applied the proper legal standards in considering Dr. Barnett's RFC questionnaire and the plaintiff's testimony. Substantial evidence supports his decision to give no weight to Dr. Barnett's opinions and not to credit the plaintiff's testimony of greater than moderate mental symptoms. Therefore, based upon the evidence as a whole, the ALJ's finding

that the plaintiff suffered moderate limitations under the B criteria of listing 12.04 is reasonable and supported by substantial evidence.[9]

The plaintiff's argument that Social Security Ruling 85-15 directs a finding of disabled is also based upon Dr. Barnett's RFC questionnaire. Pl.'s Br. 9-10. Because the ALJ properly refused to give weight to that questionnaire, plaintiff's argument is without merit.

The plaintiff's final argument is that the ALJ improperly gave weight to the opinion of LeAnn Hill, the state agency single decision maker ("SDM"), in his consideration of the plaintiff's right knee pain. Pl.'s Br. 10. Ms. Hill's physical summary recounted the medical evidence related to the plaintiff's right knee pain and concluded it did not constitute a severe impairment. R. 166. The ALJ's decision states that he gave "persuasive weight" to Ms. Hill's opinion. R. 23. Because Ms. Hill was not a physician, her Physical Summary was not opinion evidence at the ALJ hearing level. See Siverio v. Comm'r of Soc. Sec., 461 Fed. Appx. 869, 871-72 (11th Cir. 2012) (unpublished decision) (finding an RFC form completed by a single decision maker is not evidence at the ALJ level under POMS § DI 24510.050).[10] In Siverio, the ALJ erroneously believed the RFC of the SDM was a medical opinion from a State Agency physician, and gave it significant weight. Id. at 872. The Siverio court found the ALJ's improper reliance on the SDM's opinion was not harmless error. Id. at 872. However, Siverio is distinguishable from the present case.

---

[9] Because the plaintiff failed to satisfy the B criteria of listing 12.04, her argument concerning the ALJ's failure to address the A criteria of that listing is irrelevant.

[10] The POMS is a policy and procedural manual issued to help clarify the regulations for the Social Security Administration field offices.

In the present case, the ALJ was aware Ms. Hill was not a physician, and thus was not relying on her physical summary as a medical opinion. R. 23. Moreover, he did not adopt Ms. Hill's conclusion that the plaintiff's knee pain was not a severe impairment, but rather found her knee arthritis was a severe impairment at step two. R. 16. The ALJ independently discussed the medical records upon which Ms. Hill relied. R. 17. Those records show the plaintiff complained of right knee pain on May 5, 2004, after being charged by a horse. R. 17, 125. The only other relevant treatment record shows the plaintiff complained of right knee pain on July 25, 2007. R. 17, 158. The diagnosis was a contusion to the knee. R. 17, 158. She was given an injection and was to return in one month. R. 17, 158. There are, however, no further treatment notes related to the plaintiff's right knee pain.

The ALJ stated he found "the State agency examiner's conclusions were based on the record of evidence to include clinical and laboratory findings, symptoms, observations, etc., in the claimant's file, and that the report is consistent with the requirements of the above residual functional capacity assessment." R. 23. In his decision the ALJ independently considered the evidence relied upon by Ms. Hill and determined the plaintiff's testimony was not credible to the extent it was inconsistent with his RFC finding. R. 22. The reasons recited by the ALJ for not crediting the plaintiff's statements included physical activities such as walking her dogs, doing housework, and learning to play golf. These activities provide substantial evidence to support the ALJ's finding that the plaintiff's right knee pain did not prevent her from performing light work with a sit/stand option. Therefore, substantial evidence independent of Ms. Hill's findings supports the ALJ's decision, and application of the correct legal standard would not change the ALJ's decision. This distinguishes the present case from Siverio, where the court found there was not substantial evidence in the record to support the ALJ's RFC assessment except for the

SDM's opinion.  461 Fed. Appx. at 872.  Because the ALJ did not erroneously rely on the SDM's physical summary as a medical opinion, and because substantial evidence supports his decision even without consideration of the SDM's physical summary, the ALJ's error in relying on Ms. Hill's findings was harmless and does not require a remand.  See Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005) (unpublished decision) (holding an incorrect application of the regulations is harmless error when the correct application would not contradict the ALJ's ultimate findings).

## CONCLUSION

The court concludes the ALJ's determination that the plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision.  Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered contemporaneously herewith.

**DONE**, this 30th day of September, 2013.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE